**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| KEVIN BAILEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ESPERION THERAPEUTICS, INC., TIMOTHY MAYLEBEN, RICHARD BARTRAM, DOV GOLDSTEIN, M.D., DANIEL JANNEY, ROGER S. NEWTON, PH.D., and NICOLE VITULLO,<br><br>Defendants. | **Civil Action No.: 3:18-cv-11438 (RHC) (EAS)**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

NATURE OF THE ACTION ..... 1

JURISDICTION AND VENUE ..... 4

PARTIES ..... 5

RELEVANT NON-PARTIES ..... 8

SUBSTANTIVE ALLEGATIONS ..... 9

Background ..... 9

Defendants' "Singular" and "Maniacal" Focus on Bempedoic Acid ..... 10

The FDA Approval Process for Bempedoic Acid ..... 13

Defendants' Oversight of the Clinical Trials and Knowledge of Bempedoic Acid's Significant Safety Risks ..... 15

(i) Two Phase 2 Deaths ..... 19

(ii) Phase 3 Safety Protocol Changes Due to Serious Adverse Events ..... 20

(iii) Phase 3 Deaths ..... 21

(iv) Out-of-Control Results Concerning Kidney Filtration ..... 21

Materially False and Misleading Statements and Omissions Issued During the Class Period ..... 22

The Truth Begins to Emerge ..... 47

Additional Allegations Supporting Scienter ..... 51

PLAINTIFFS' CLASS ACTION ALLEGATIONS ..... 55

COUNT I ..... 59

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ..... 59

COUNT II ..... 61

(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants) ..... 61

PRAYER FOR RELIEF ..... 62

DEMAND FOR TRIAL BY JURY ..... 63

Lead Plaintiffs Manuele Aldi Scarpatetti and Aurelio Scarpatetti ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following set forth herein. The allegations are based upon (i) personal knowledge as to themselves and their own acts and (ii) information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, without limitation, a review of Defendants' public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Esperion Therapeutics, Inc. ("Esperion" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, and information learned from an investigation. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Esperion common stock between February 22, 2017 and May 22, 2018, both dates inclusive (the "Class Period"), and were damaged thereby, against Esperion and certain of its directors and executives, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2. Esperion, self-proclaimed "The Lipid Management Company," is a pharmaceutical company whose *raison d'etre* since inception has been the research and development of its only pipeline drug, bempedoic acid (and a bempedoic acid/ezetimibe combination pill). The

Company began its Phase 3 clinical testing of bempedoic acid in January 2016, to prove its safety and efficacy, with an eye toward seeking regulatory approval to market the drug from the U.S. Food and Drug Administration. Given the Company's admitted "singular" and "maniacal" focus on its lead drug candidate, Defendants CEO Timothy M. Mayleben and CFO Richard B. Bartram, as well as other Esperion executives and directors, had daily involvement in the testing and approval process and stayed consistently apprised of results from the bempedoic acid clinical trials.

3. The Company cannot market bempedoic acid until it receives regulatory approval. Esperion has never obtained regulatory approval for, and thus does not sell or receive revenue from, any other product candidates. In other words, as Esperion has acknowledged, its future depends almost entirely on the successful clinical development, regulatory approval, and commercialization of bempedoic acid. Indeed, Esperion has sustained significant operating losses since inception—reaching as high as $167.0 million in losses for 2017—and has burned significant amounts of investor money on research and development of bempedoic acid. Esperion has had to finance itself through public securities offerings. With no current source of product revenue, there is no end in sight to its significant losses in operations absent regulatory approval of bempedoic acid.

4. Bempedoic acid purportedly helps reduce LDL-cholesterol ("LDL-C"). It is well-documented that current competing treatments, such as statins, are highly effective at reducing LDL-C (*e.g.*, Lipitor®, the most prescribed LDL-C lowering drug in the world). However, statins cause severe side effects. Admittedly aware of its competition, and the shortcoming with statins, Esperion understood the urgency of gaining a competitive advantage by developing an LDL-C reducing drug with less side effects and greater tolerability.

5. To convince investors that Esperion could obtain this critical competitive advantage over statins, Defendants consistently issued statements throughout the Class Period attesting to the tolerability and safety of bempedoic acid purportedly based on results from "our ongoing or completed clinical studies." Investors and analysts alike focused on the Company's only imminent chance at revenue production and bought into Defendants' assurances regarding the drug's safety.

6. But while trumpeting bempedoic acid's safety and tolerability, Defendants knew or at minimum recklessly disregarded substantial safety and tolerability issues revealed from the bempedoic acid clinical results. Specifically, several red flags alerted Defendants to the safety deficiencies with the drug which, at best put the competitive advantage they needed at risk, and at worst, jeopardized their chances of regulatory approval altogether. These unambiguous warnings that Defendants received included: (i) two Phase 2 deaths known by mid-2016; (ii) changes made to Phase 3 safety protocols by mid-2017 necessitated by serious, adverse safety issues and countless adverse safety reports; (iii) Phase 3 deaths known by late-2017; and (iv) out-of-control kidney filtration results known by late-2017.

7. All the while, Defendants lined their own pockets. For example, during the Class Period and while Esperion's common stock was artificially inflated, several of the Individual Defendants engaged in sizable, suspicious, and unusual sales of their Esperion common stock. In total during the Class Period, the Individual Defendants sold approximately 1,279,996 shares of Esperion common stock, generating approximately $57,414,160 in proceeds. Esperion's compensation committee also tethered exceptionally lucrative compensation and bonuses for executives and/or directors to the regulatory approval process for bempedoic acid.

8. Defendants' deception first came to light in May 2018 when Esperion revealed alarming safety results from the Phase 3 clinical trial. Specifically, the Company revealed that clinical trial patients treated with bempedoic acid died at a far greater rate than those patients treated with the placebo: as of May 23, 2018, there were 14 deaths in the bempedoic-acid group (sample size of 2,668) or 0.5%, compared to only 2 deaths in the placebo group (sample size of 1,338) or 0.2%. The bempedoic-acid group also experienced far more severe side effects and tolerability issues than the placebo group. Notably, the patient population in the bempedoic acid group was no sicker at the outset of clinical testing than the patients in the placebo group.

9. These shocking, adverse safety results reverberated throughout the investment community. Several analysts cited the long-awaited, disappointing safety results as significant risks to approvability.

10. Overall, prior to the beginning of the revelations of the truth, Esperion's common-stock shares closed at $70.50 on May 1, 2018. After the curative disclosures alleged here, the share price has plummeted $32.18, or 45.65%, to $38.32 at the close on May 23, 2018, eviscerating significant value. Plaintiffs and other Class members suffered significant losses and damages as a result of Defendants' alleged fraud and this precipitous decline in the market value of Esperion's common-stock price.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Esperion's principal executive offices are located within this Judicial District. A significant portion of Defendants' actions and the subsequent damages took place in this Judicial District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15. Plaintiffs, as set forth in the certifications previously provided to the Court, acquired Esperion common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged curative disclosure.

16. Defendant Esperion is a biopharmaceutical company founded in January 2008 and incorporated in Delaware, with its principal executive office located at 3891 Ranchero Drive, Suite 150, Ann Arbor, Michigan 48108. Esperion's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ESPR."

17. Defendant Timothy M. Mayleben ("Mayleben") served as Esperion's Chief Executive Officer ("CEO"), president, and a director on the Company's board of directors ("Board") during the Class Period. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions.

18. Defendant Richard B. Bartram ("Bartram") served as Esperion's Chief Financial Officer ("CFO"), vice president ("VP") of finance, principal accounting officer, and corporate secretary during the Class Period. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions.

19. Defendant Dr. Dov Goldstein, M.D. ("Dr. Goldstein") served as a director on the Board during the Class Period. He has been a member of the Board's audit committee ("Audit Committee"). He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions. As an Audit Committee member, Defendant Dr. Goldstein's responsibilities included: reviewing, discussing with Esperion's management, and approving the Company's disclosures in SEC filings; addressing with the CEO and senior accounting executive fraud involving management or other employees; and discussing with management policies governing risk exposure and legal and regulatory compliance. According to Esperion, as a director on the Board, Defendant Dr. Goldstein "oversees the management of risks inherent in the operation of our business and the implementation of our business strategies."

20. Defendant Daniel Janney ("Janney") served as a director on the Board, including as an Audit Committee member, during the Class Period. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions. As an Audit Committee member, Defendant Janney's responsibilities included: reviewing, discussing with Esperion's management, and approving the Company's disclosures in SEC filings; addressing with the CEO and senior accounting executive fraud involving management or other employees; and discussing with management policies governing risk exposure and legal and regulatory compliance. According to Esperion, as a director on the Board, Defendant Janney "oversees the management of risks inherent in the operation of our business and the implementation of our business strategies."

21. Defendant Dr. Roger S. Newton, Ph.D. ("Dr. Newton") is Esperion's founder and has served as a director on the Board during the Class Period. He signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions. Up until

December 2016, Defendant Dr. Newton was the Board's executive chairman and the Company's chief scientific officer. He was a named executive officer of the Company. Effective December 8, 2016, Defendant Dr. Newton continued as Esperion's scientific advisor and remained a director on the Board. In accordance with NASDAQ rules, Esperion does not consider Defendant Dr. Newton an independent director. Defendant Dr. Newton was the co-founder, president, and CEO of the original Esperion from July 1998 until its acquisition by Pfizer Inc. in 2004. According to Esperion, as a director on the Board, Defendant Dr. Newton "oversees the management of risks inherent in the operation of our business and the implementation of our business strategies."

22. Defendant Nicole Vitullo ("Vitullo") served as a director on the Board, including as Esperion's lead independent director who coordinated the independent directors' activities, the chairperson of the nominating and governance committee, and a compensation committee member, during the Class Period. She signed SEC filings during the Class Period that are alleged to have included material misstatements and omissions. According to Esperion, as a director on the Board, Defendant Vitullo "oversees the management of risks inherent in the operation of our business and the implementation of our business strategies."

23. The Defendants referenced above in ¶¶ 17-22 are sometimes referred to herein as the "Individual Defendants."

24. Each of the Individual Defendants:

a) directly participated in Esperion's management;

b) was privy to confidential, proprietary information concerning Esperion and its business and operations;

c) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and omissions and information alleged herein;

d) was directly or indirectly involved in the oversight or implementation of Esperion's internal controls;

e) was aware of or recklessly disregarded the fact that the false and misleading statements and omissions were being issued concerning Esperion; and/or

f) (f) approved or ratified these statements and omissions in violation of the federal securities laws.

25. Esperion is liable for the Individual Defendants and its employees' acts under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26. The Individual Defendants and Esperion's other employees and agents' scienter is similarly imputed to Esperion under *respondeat superior* and agency principles.

27. Defendants Esperion and the Individual Defendants are collectively referred to herein as "Defendants."

## RELEVANT NON-PARTIES

28. Confidential informant ("CI") 1 worked for the Center for Advanced Research and Education ("CARE") in Gainesville, Florida, and served as a clinical coordinator for the bempedoic acid clinical trials from around November 2016 until January 2018.

29. CI 2 served as Esperion's vice president of clinical development ("VP of Clinical Development") from around August 2016 until November 2017. CI 2 reported to Esperion's chief medical officer at that time, Dr. Mary P. McGowan, M.D. ("Dr. McGowan").

30. CI 3 served as Esperion's human resources coordinator and administrative assistant from around February 2014 until July 2016. CI 3 worked at Esperion's headquarters in Ann Arbor and, at various times during that term of employment, reported directly to Defendants Mayleben and Bartram and the Company's senior vice president of global regulatory affairs, Ashley Hall ("Hall"), who was one of Esperion's executives who oversaw the bempedoic acid

clinical trials from a medical and regulatory standpoint and was responsible for sending information to the U.S. Food and Drug Administration ("FDA").

31. CI 4 served as Esperion's head of project management from around March 2017 until December 2017. CI 4 reported directly to Defendant Bartram until October 2017 and then directly to Hall.

## SUBSTANTIVE ALLEGATIONS

### Background

32. Esperion is a small biopharmaceutical company, with 57 full-time employees as of December 31, 2017, 37 of which are engaged in drug research and development. It owns the exclusive worldwide rights to the bempedoic acid-based franchise of products in development, which is also referred to as ETC-1002. Bempedoic acid, Esperion's lead drug candidate, is a small-molecule drug that is synthesized from readily available raw materials using conventional chemical processes.

33. As Defendant Mayleben has publicly described, Esperion has "singularly" and "maniacally" focused its efforts and financial resources on developing bempedoic acid and the bempedoic acid/ezetimibe combination pill. The Company has dedicated its resources to research and development activities, including conducting nonclinical, preclinical, and clinical studies. Esperion has not commenced principal operations and cannot formally market bempedoic acid until it receives FDA approval. ***With no approved drugs on the market, and no other drugs in its development pipeline, Esperion admits that its future depends almost entirely on the successful clinical development, regulatory approvals, and commercialization of bempedoic acid***.

34. Faced with mounting losses and no revenue stream to mitigate those losses, Esperion has been forced to fund its operations primarily through proceeds from sales of

preferred stock, convertible promissory notes and warrants, public offerings of common stock, and the incurrence of indebtedness. Esperion only succeeded in raising this money by representing bempedoic acid, its sole drug candidate, as a promising approval prospect with a beneficial safety profile that distinguishes it from its tried and true statin competitors. For example, in August 2017, Esperion closed an underwritten offering of 3,565,000 shares of common stock, at a public offering price of $49.00 per share, with net proceeds of $164.0 million. The Company plans to continue funding operations through public or private equity or debt financings or through other sources, including collaborations with third parties.

35. Since inception, Esperion has sustained significant operating losses each year. Esperion's net losses were $49.8 million, $75.0 million, and $167.0 million for the years ended December 31, 2015, 2016, and 2017, respectively. As of December 31, 2017, the Company had an accumulated deficit of $396.3 million. Esperion has stated in its SEC filings that it expects to incur increasing levels of operating losses over the next several years and for the foreseeable future, as the Company progresses through the clinical development program for bempedoic acid and the bempedoic acid/ezetimibe combination pill. The Company admits that its prior losses, combined with expected future losses, have had and will continue to have an adverse effect on stockholders' equity and working capital. In other words, during the Class Period, investors in Esperion stock were banking on the Company obtaining a timely approval to market and sell bempedoic acid so that its losses could finally shift to profit.

**Defendants' "Singular" and "Maniacal" Focus on Bempedoic Acid**

36. According to Esperion, bempedoic acid is a targeted therapy that has been shown to significantly lower elevated LDL-C, also known as bad cholesterol, and other cardio metabolic risk factors, including in patients inadequately treated with current lipid-modifying therapies.

37. Elevated LDL-C is a significant risk factor in cardiovascular disease and contributes to a build-up of fat, cholesterol, and plaque deposits in and on artery walls, a condition known as atherosclerosis. This in turn causes arterial blockages, heart attacks, strokes, and other heart disease, which is the leading cause of death in the U.S. Approximately 80 million U.S. adults, or more than 20% of the population, have elevated LDL-C, known as hypercholesterolemia; an additional 73 million people in Europe and 30 million people in Japan have elevated LDL-C.

38. The current standard care for patients with high LDL-C is a family of drugs called statins. Statins are selective, competitive inhibitors of HMG-CoA reductase, a rate-limiting enzyme in the cholesterol-biosynthesis pathway in liver cells. Statin inhibition of cholesterol synthesis increases the number of LDL receptors on the surface of liver cells. This increase in LDL receptors increases uptake of LDL particles into liver cells from the blood, thus lowering LDL-C levels. Statins are also thought to have a potential effect on cholesterol synthesis in skeletal muscle. This effect could be linked to the myalgia associated with statin use, as seen in certain patients with statin intolerance.

39. According to Esperion, statins are highly effective at lowering LDL-C, with well-documented benefits. This class of drugs includes atorvastatin calcium, marketed as Lipitor®, the most prescribed LDL-C lowering drug in the world. Roughly 40 million U.S. adults are on statin therapy.

40. *However*, many patients still need additional help to lower their LDL-C despite taking the maximally tolerated statin therapy. In addition, there is a significant subset of patients unable to tolerate statins due to adverse events, including muscle pain or weakness, increased glucose levels, memory loss, and in rare and extreme cases, muscle breakdown, kidney failure,

and death. The FDA has warned that statins can cause hyperglycemia, an increase in blood sugar levels, and create an increased risk of worsening of glycemic control and of new onset diabetes. There are approximately 36 million U.S. adults with elevated LDL-C levels who are not on an LDL-C lowering therapy. Esperion estimates that 4 million American adults are statin-intolerant due to these side effects.

41. The LDL-C-elevated patient population also includes those suffering from clinical atherosclerotic cardiovascular disease ("ASCVD"), a slow, progressive disease characterized by the hardening and narrowing of arterial walls, and heterozygous familial hypercholesterolemia ("HeFH"), a genetic condition characterized by impaired cholesterol metabolism and clinically elevated blood cholesterol. There are approximately 13 million people in the U.S. with ASCVD and/or HeFH who live with elevated levels of LDL-C despite taking maximally-tolerated lipid-modifying therapy, including individuals considered statin intolerant, leaving them at high risk for cardiovascular events. Patients with those conditions are often unable to reach their recommended LDL-C levels using statins alone, so Esperion claims that adding bempedoic acid to their treatment may help them reach their LDL-C levels without additional troubling side effects.

42. According to Esperion, unlike statins, bempedoic acid does not inhibit the cholesterol-biosynthesis pathway in skeletal muscle nor promote the associated cytotoxicity believed to lead to muscle-related side effects. It is differentiated in one key way: bempedoic acid is inactive until it enters the liver, where it is converted to its active form by the enzyme, ACSVL1–an enzyme not found in skeletal muscle cells. Once in the liver, bempedoic acid is converted to a coenzyme A ("CoA") derivative, or ETC-1002-CoA, which directly inhibits ACL, a key enzyme that supplies substrate for cholesterol and fatty acid synthesis in the liver.

Bempedoic acid therapy works solely in the liver to block cholesterol biosynthesis. Inhibition of ACL by ETC-1002-CoA results in reduced cholesterol synthesis and upregulation of LDL receptor activity in the liver. This promotes the removal of LDL-C from the blood. Similar to statins, bempedoic acid also reduces hsCRP, a key marker of inflammation associated with cardiovascular disease.

43. Esperion has hypothesized that muscle pain associated with statin use is linked to the ability of statins to inhibit cholesterol synthesis in skeletal muscle cells. Bempedoic acid is specific to the liver and cannot inhibit cholesterol synthesis in skeletal muscle cells, thereby having the potential to reduce muscle-related side effects. The safety, tolerability, and lessening of side effects are thus a main selling point of bempedoic acid and its key differentiator from competitor statins.

44. Esperion projects that the market for an alternative to statins may exceed the number of statin-intolerant patients because some patients who experience, but tolerate, statins' negative side effects may choose an alternative that does not produce those ill effects.

**The FDA Approval Process for Bempedoic Acid**

45. Esperion has sought approval from the FDA of both bempedoic acid and the bempedoic acid/ezetimibe combination pill. Any new drug must be put through a series of clinical trials to prove its safety and efficacy before it can be marketed and sold in the U.S. This includes human clinical trials that proceed in three phases. Phase 1 studies usually involve 20 to 80 subjects and are designed to determine how the drug works in humans and the side effects associated with increasing doses. *See* 21 C.F.R. § 312.21(a). Phase 2 studies usually involve no more than several hundred subjects and are designed to evaluate the effectiveness of the drug and common short-term side effects and risks. *See* 21 C.F.R. § 312.21(b). Phase 3 studies "are intended to gather the additional information about effectiveness and safety that is needed to

evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *See* 21 C.F.R. § 312.21(c). Such studies are considerably more extensive than Phase 2 studies. Phase 3 studies are large-scale trials, usually involving several hundred to several thousand subjects and are intended to gather the information necessary to provide an adequate basis for labeling the drug. *See* 21 C.F.R. § 312.21(c).

46. After Phase 3, the company that developed the drug (also known as the "sponsor") can submit a new drug application ("NDA") to the FDA. The FDA considers all of the clinical trials results and nonclinical studies in determining whether to approve a drug for market. *See* 21 C.F.R. §§ 314.125(b), 314.126(a). In addition, the FDA may require further Phase 3 and Phase 4 testing to further assess a drug's safety and effectiveness after NDA approval and may require testing and surveillance programs to monitor the safety of approved products that have been commercialized.

47. By January 2016, Esperion had conducted Phase 1a, 1b, 2a, and 2b studies. The Phase 1a and 1b studies were on healthy subjects and included single-dose and multiple-ascending-dose studies. The Phase 2a and 2b studies were on patients with elevated LDL-C, some who were statin intolerant, some with statin-add-ons, some with statin tolerance, and some with hypertension, and some of the studies were monotherapy, some were placebo-controlled, and some were in combination with ezetimibe.

48. In January 2016, Esperion initiated its global, pivotal Phase 3 clinical development program to evaluate the safety, tolerability, and consistent LDL-C-lowering efficacy of bempedoic acid and the bempedoic acid/ezetimibe combination pill in patients with ASCVD, or who are at a high risk for ASCVD, with hypercholesterolemia who continue to have elevated levels of LDL-C despite the use of maximally-tolerated statins and ezetimibe. The program

included five studies in approximately 4,000 patients: two pivotal studies (both 52-weeks) evaluating bempedoic acid (Studies 1 & 2) in 3,009 patients with ASCVD on maximally-tolerated statins; two pivotal studies (one is 24 weeks and another 12 weeks) evaluating bempedoic acid (Studies 3 & 4) in 614 patients with ASCVD, or at a high risk for ASCVD, considered statin intolerant; and one pivotal study evaluating the bempedoic acid/ezetimibe combination pill (053 Study) in 382 patients with ASCVD, or at high risk for ASCVD, on maximally tolerated statins.

49. ***Significantly, studies in both Phase 2 and Phase 3 were on similar patient pools: those with elevated LDL-C, some who were statin tolerant, and some who were statin intolerant.***

**Defendants' Oversight of the Clinical Trials and Knowledge of Bempedoic Acid's Significant Safety Risks**

50. Defendants Mayleben and Bartram were aware of or at minimum recklessly disregarded substantial safety and tolerability issues revealed during the bempedoic acid clinical results. These issues included: (i) two Phase 2 deaths known by mid-2016; (ii) changes made to Phase 3 safety protocols by mid-2017 resulting from serious, adverse safety issues and numerous adverse safety reports; (iii) Phase 3 deaths known by late-2017; and (iv) out-of-control kidney filtration results known by late-2017.

51. According to CI 3, Defendants Mayleben and Bartram were very involved in overseeing the bempedoic acid clinical trials. They participated in weekly update meetings regarding the clinical trials, which CI 3 coordinated at Esperion's headquarters in Ann Arbor. Hall and other executives involved in running the clinical trials also attended these meetings at which they presented trial findings and data, often in the form of PowerPoint presentations. During these meetings, each executive presented updates about their area of focus. One area was

safety. CI 3 said that there was a safety committee that oversaw safety results from the bempedoic clinical trials.

52. CI 3 said that Defendant Mayleben kept apprised of developments in the bempedoic acid clinical trials, including observed side effects. Esperion's senior director of clinical development, among others involved in running the clinical trials, communicated this information to Defendant Mayleben.

53. Corroborating this, CI 2 also said that Defendant Mayleben kept close tabs on the bempedoic acid clinical trials in a granular way. CI 2 had meetings with Defendant Mayleben to discuss the bempedoic acid clinical trials. During those conversations, CI 2 was surprised about the level of detail Defendant Mayleben knew about the bempedoic acid clinical trials. CI 2 said that Defendant Mayleben's knowledge of granular details, including even non-essential information about enrollment information, was unusual for a CEO. CI 2 explained that Esperion's executive leadership team (which includes the Individual Defendants) was very involved because it was a small company.

54. Corroborating both CI 3 and CI 2, CI 4 said that Defendants Mayleben and Bartram micromanaged the bempedoic acid clinical trials on a daily basis. CI 4, who had approximately 25 years of previous experience at 6 other pharmaceutical companies, had never observed such control from upper level management.

55. CI 4 was the head of project management and the global program head for the bempedoic acid clinical trials. In this role, CI 4 was responsible for bringing the entire operations aspect of the Phase 3 bempedoic acid program together. CI 4 would bring the project team together every two weeks or so to discuss what was happening from an operations standpoint.

56. CI 4 kept minutes of these meetings and presented them to Defendants Mayleben and Bartram and other Esperion executives at leadership team meetings. CI 4 attended leadership meetings with Defendant Mayleben, Defendant Bartram, Hall, McGowan, and other Esperion executives. These meetings were sometimes held weekly, sometimes every other week, but at minimum once a month.

57. CI 4 said that all adverse events were reported to Defendant Mayleben as they happened. CI 4 said that Dr. McGowan would have known details about the deaths occurring in Phase 3 and (personally or through one of her colleagues) reported these safety issues to Defendants Mayleben and Bartram. CI 4 said that pharmaceutical companies typically collect and analyze safety data to determine whether there is an adverse trend. The safety details that Dr. McGowan would have known and reported to Defendants Mayleben and Bartram included, without limitation, details about deaths, including the circumstances surrounding the deaths and other drugs the patients may have been taking.

58. CI 4 implemented a weekly reporting mechanism referred to as a dashboard update, which included status updates about the bempedoic acid clinical trials. CI 4 provided this to the leadership team, including Defendants Mayleben and Bartram, on a weekly basis through email. The dashboard included projected NDA submission dates based on the progress of the studies. CI 4 and Defendant Mayleben argued over the NDA submission timeline, and the dashboard updates were eventually scrapped. CI 4 conveyed to Defendant Mayleben that Defendant Mayleben's demanded timeline for the NDA submission was impractical for being too short.

59. CI 4 said that what Defendant Mayleben had Esperion disclose to investors about the timing of the NDA-submission process to the FDA did not align with reality. CI 4 said that

Defendant Mayleben and Esperion's leadership team's approach to the NDA-submission process was backwards in the sense that Defendant Mayleben demanded that the submission be ready by a certain date and that the team should work backwards to figure out how to meet it. CI 4 said that since joining Esperion, it was clear that the Company could not meet the proposed NDA-submission dates that Esperion and Defendant Mayleben were conveying externally. CI 4 was very transparent with Defendant Mayleben and Esperion's leadership that the proposed NDA-submission deadlines were unrealistic, based on CI 4's 25-years of experience with other pharmaceutical companies. CI 4 urged them to review what was being said externally to align with reality, given the time that it would have taken, based on good practices in the pharmaceutical industry, to get patients, conduct the trials, assess the data, and prepare the data for the NDA submission. CI 4 said that Defendant Mayleben did not listen and demanded that they meet the NDA-submission deadlines. CI 4 said the culture at Esperion was not to push back against Defendant Mayleben no matter what Defendant Mayleben wanted, even if it was absurd.

60. CI 4 said that Esperion's leadership, and Defendant Mayleben in particular, focused on keeping the Company's stock price as high as possible. CI 4 explained that they needed the price high to raise additional money from securities offerings. Moreover, CI 4 said that getting FDA approval for bempedoic acid quickly was paramount. According to CI 4, an approval meant a high stock price and a greater chance that another entity would acquire Esperion and make its leadership team very rich.

61. CI 4 said that Defendant Mayleben's push to speed up the NDA submission could have impacted the quality of the bempedoic acid clinical studies. CI 4 explained that it required

a lot of time to ensure the quality of data for submission to the FDA. By rushing to meet a deadline, Esperion left room for error.[1]

#### *(i) Two Phase 2 Deaths*

62. CI 3 stated that Esperion knew about the two deaths that occurred during the Phase 2 bempedoic clinical trials no later than July 2016. CI 3 said that Defendant Mayleben decided to push forward with the drug nonetheless.

63. CI 3 coordinated weekly meetings attended by Defendants Mayleben, Bartram, and other Esperion senior officers, during which the senior officers discussed clinical-trial results. CI 3 said that these two deaths were discussed at one of these meetings. These meetings were typically held monthly when data was released from the bempedoic acid clinical trials.

64. CI 4 said that as soon as a death occurred during the trials, Esperion leadership (including Defendants Mayleben and Bartram) would have learned about it. Indeed, CI 4 said that Defendant Mayleben insisted on knowing everything, so when data was reported to Esperion, it would have been reported to him.

65. CI 2 said that Esperion generally received notifications about patients' deaths from the trial site within 24 to 48 hours of each death.

66. CI 1 worked on the bempedoic clinical trial beginning in November 2016. In March and April 2017, CI 1 began screening patients, providing informed-consent forms, checking for clinical trial eligibility, collecting and entering patient data, and monitored patients'

[1] Defendant Mayleben's irresponsibility extended beyond his foolhardy rush to push forward with the NDA process for bempedoic acid. CI 3 said that Defendant Mayleben spent investors' money foolishly. CI 3 said that Defendant Mayleben hired his common-law wife to work as a consultant with astronomical compensation without corresponding contribution to Esperion. CI 3 said that in January 2016, Defendant Mayleben hired his common-law wife's son to replace CI 3 as his administrative assistant, at which point CI 3 was assigned to performing human-resources duties and was the administrative assistant for Defendant Bartram and Hall. CI 3 said that Defendant Bartram knew about Defendant Mayleben's foolish spending of investors' money but that Defendant Bartram never went against Defendant Mayleben.

progress. By May or June 2017, the trial began. CI 1 explained that clinical trials typically started with all patients taking a placebo for about three months to get them used to taking medication and coming in for follow-up. After the first three months, patients either began receiving the drug or kept taking the placebo, depending on their group designation. CI 1 monitored their progress. If the patient experienced adverse side effects, a clinical research assistant would complete either an adverse event ("AE") or serious adverse event ("SAE") form and send it to the Institution Regulation Board ("IRB"), which is a patients' rights group responsible for the welfare of the patient. This information would also be sent through email to Esperion.

#### *(ii) Phase 3 Safety Protocol Changes Due to Serious Adverse Events*

67. CI 2 said that Esperion made changes to the bempedoic acid clinical trials because of serious adverse events.

68. Corroborating this, CI 4 said that Phase 3 bempedoic acid clinical-trial protocols were changed in mid-2017, following an adverse safety event. CI 4 stated that only a serious adverse event or death would have triggered a protocol change. Indeed, included in the protocol change was the rule that patients taking other medications could no longer participate in the trial. CI 4 stated that this type of protocol change indicated a safety concern. CI 4 made clear that Defendants Mayleben and Esperion's leadership had immediate knowledge of and directly handled any safety issues.

69. CI 4 said that around that time, Esperion hired an outside consultant to help gather adverse events and put them into a format to help prepare for an NDA submission. CI 4 said that outside consultants were hired in the third quarter of 2017 to handle safety events that had "piled up" and that had occurred during the course of the bempedoic acid safety clinical trials. CI 4

explained that he became aware of this pile up of adverse events while helping Esperion prepare for a pre-approval FDA inspection in the third quarter of 2017.

70. CI 4 said that in the summer or fall of 2017, Defendant Mayleben and Dr. McGowan had a falling out resulting from a disagreement over how to handle certain safety issues. Dr. McGowan was thereafter demoted from her position as chief medical officer and no longer involved in key discussions about the drug.

71. Consistent with CI 4's statements, Esperion disclosed that Dr. McGowan, formerly identified as an executive officer of the Company in her role as chief medical officer, was no longer an executive officer of the Company as of December 14, 2017 and ultimately resigned effective March 31, 2018.

#### *(iii) Phase 3 Deaths*

72. CI 2, who worked on the Phase 1, 2, and 3 trials, said that he learned about the deaths in Phase 3 in his role as Esperion's VP of Clinical Development. CI 2 developed, executed, and interpreted the data from the clinical trials. CI 2 said that a data monitoring committee ("DMC") conducted ongoing reviews of the un-blinded trial data, including details about patient deaths to ensure trial safety, so they would know if the patients who died were on bempedoic acid or the placebo. The DMC reviewed the trial data on a regular basis and received reports of adverse events quickly. If the DMC had concerns about bempedoic acid's safety or trials, they would report it to Esperion and recommend changes to the trial to improve safety protocols. As noted above, changes to the safety protocols did in fact occur.

#### *(iv) Out-of-Control Results Concerning Kidney Filtration*

73. CI 1 said that as of December 2017, Esperion knew about adverse effects related to kidney function in patients in the bempedoic acid clinical trials. CI 1 was a clinical coordinator

at CARE, a research center that worked on the bempedoic acid clinical trials. CI 1 said that CARE informed IRB and Esperion about troubling test results on kidney filtration.

74. CI 1 said, and CI 4 corroborated, that such adverse events were reported within 48 hours.

75. CI 1 said that all bempedoic acid trial results and lab reports, including adverse events, were stored in a database called Quintiles. CI 1 said that the Quintiles database had an email notification system that alerted everyone through email about the trials, including those from Esperion, CARE, IRB, and other organizations that worked on the trials, when adverse events occurred or when patients were being removed from trials. CI 1 said that Esperion would learn about adverse events immediately. CI 1 said that someone from CARE communicated to Esperion several times during the course of the bempedoic clinical trials.

**Materially False and Misleading Statements and Omissions Issued During the Class Period**

76. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts, regarding the following: (i) bempedoic acid caused serious undisclosed adverse side effects, including death; (ii) these safety issues raised multiple risks, including that Esperion could fail to achieve the competitive advantage it sought over statins due to its deleterious safety profile, the FDA could decline to approve the drug for commercialization altogether, or the FDA could require additional information from costly clinical trials, thus delaying any approval and possible revenue generation; (iii) these safety risks subjected Esperion to financial risk; (iv) these safety risks subjected Esperion to potential reputational damage; and (v) these safety risks rendered it less likely that Esperion would secure a partner to commercialize bempedoic acid.

77. The Class Period begins on February 22, 2017, when Esperion filed a Form 10-K with the SEC for the year ended December 31, 2016, which Defendants Mayleben, Bartram, Dr. Goldstein, Janney, Dr. Newton, and Vitullo signed ("2016 10-K"). Esperion stated the following concerning bempedoic acid's safety and tolerability, in relevant part:

> With a targeted mechanism of action, bempedoic acid is a first-in-class, orally available, once-daily ACL inhibitor that reduces cholesterol biosynthesis and lowers elevated levels of LDL-C by up-regulating the LDL receptor, ***but with reduced potential for muscle-related side effects***.
>
> ***
>
> ***Bempedoic acid added to atorvastatin 80 mg produced no clinically relevant effects on atorvastatin PK, and appeared to be safe and well-tolerated, with no serious adverse events reported.***
>
> ***
>
> To date, in completed studies, over 800 patients have been treated with bempedoic acid for periods of up to 12 weeks at maximum repeated doses of 240 mg per day. ***Bempedoic acid has been safe and well-tolerated with no dose-limiting side effects identified to date in our ongoing or completed clinical studies. No clinical safety trends have emerged to date.***[2]

78. The statements in ¶ 77 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

79. The 2016 10-K contained Defendant Mayleben's signed SOX certifications, which included the following language: the 2016 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[;]" Defendant Mayleben "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

[2] All emphasis is added herein, unless stated otherwise.

within those entities, particularly during the period in which this report is being prepared;" "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" was disclosed to the Audit Committee and the Company's auditors; and "the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company[.]"

80. The statements in ¶ 79 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

81. On March 20, 2017, Esperion held a conference call for investors and analysts, in which Defendants Mayleben and Bartram participated, amongst others. Defendant Mayleben stated the following in relevant part: "First, I would just highlight that last October we reported positive results from the Phase 2, 035 study of bempedoic acid in combination with a high-dose statin and demonstrated 22% incremental LDL cholesterol lowering and hsCRP reduction ***with no safety or tolerability issues***."

82. During the same call, Defendant Mayleben responded to a series of questions from Michael Yee ("Yee") of RBC Capital Markets, stressing the safety of the drug based on trial results:

> [Yee:] One was just sort of understanding, I guess, certainly coincidental post-ACC but how did this all come about? Was there one or two or three things that they told you had sort of changed their mind or put them over the tipping point to tell you all of this? Presumably the Amgen data recently was part of that, so maybe you could just give a little context on how this came about and what they told you that gives you all this confidence.
>
> Then the second question was since the Amgen data where they had an almost 60% reduction in cholesterol and a 15% to 20% benefit in outcomes, I guess why do you feel so confident in ultimately your results?

***

> [Defendant Mayleben:] ***We had great data on -- from our Phase 2 study in 1,000 patients that the drug lowered LDL cholesterol and hsCRP and was safe and well tolerated*** out to 12 weeks, but folks were questioning whether that would be true at 52 weeks and that's the reason, of course, that you run a Phase 3 study like this.

83. The statements in ¶¶ 81-82 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

84. On April 17, 2017, Esperion hosted a conference call for its annual shareholders meeting, in which Defendants Mayleben and Bartram participated, amongst others. Defendant Mayleben in his opening remarks stated the following, in relevant part: "In over 1,000 patients studied, and 8 completed Phase I and Phase II studies of bempedoic acid, ***we've observed consistent efficacy, safety and tolerability***."

85. The statements in ¶ 84 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

86. On April 17, 2017, Esperion made a presentation for its annual meeting of its stockholders. On a slide concerning "Esperion's Commitment to Bempedoic Acid[,]" under a column entitled "Pathway to Approval Clearly-Defined[,]" Esperion disclosed that that there was an "***[a]ttractive safety and tolerability profile*** and consistent LDL-C lowering efficacy in multiple clinical trials across multiple patient populations[.]" (Emphasis in original.)

87. The statements in ¶ 86 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

88. On May 4, 2017, Esperion filed with the SEC a Form 10-Q report for the quarter ended March 31, 2017, which Defendant Mayleben signed ("Q1 2017 10-Q"). Esperion stated that "[w]ith a targeted mechanism of action, bempedoic acid, the Company's lead product candidate, is a first-in-class, orally available, once-daily ATP-citrate lyase ("ACL") inhibitor that

reduces cholesterol biosynthesis and lowers elevated levels of LDL-C by up-regulating the LDL receptor, ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

89. The statements in ¶ 88 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

90. The Q1 2017 10-Q contained Defendant Mayleben's signed SOX certifications with language substantially similar in all material respects to that in Defendant Mayleben's signed SOX certifications in the 2016 10-K, which were articulated above in ¶ 79.

91. The statements in ¶ 90 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

92. On May 23, 2017, Esperion hosted a conference call at the UBS Global Healthcare Conference, in which Defendant Mayleben participated, amongst others. Defendant Mayleben stated the following about bempedoic acid's purported safety and tolerability, as compared to statins, in relevant part:

> I think what is most interesting about the drug is not only the enzyme target, which is ATP Citrate Lyase and enzyme on the cholesterol biosynthesis pathway and we've seen it on cholesterol biosynthesis pathway because it's familiar. It's the same pathway as statins. So it's a similar mechanism of action, we sometimes get questions about, what -- if it's on the same pathway? Does that cause problems? ***And I think happily, the answer has been, no.*** We see incremental LDL-cholesterol lowering even on top of statins, ***and it's been extremely safe and well tolerated as well***.
>
> ***
>
> And then, the other key feature of our drug and something that we didn't know and certainly hadn't been published on until last November, is that our drug is only active in the liver, it's a prodrug, which means that it's relatively inert when it's within the plasma compartment of the body but when it gets into the liver cells or into the liver, it's converted by a key enzyme there, and that enzyme renders it an active drug. What is most interesting about that feature, is most folks believe that the reason that patients -- certain patients can't tolerate statin

drugs is because statins continue to inhibit cholesterol synthesis in muscle cells, in addition to the liver cells. And so as a result, cause this muscle pain and muscle weakness that are associated with statins, not in all patients who take statins, but in somewhere between 5% and 20% of patients, who are prescribed statins, they end up with myalgia or muscle symptoms. So we think that should provide a really nice benefit for patients over time, who need LDL-cholesterol lowering, can't tolerate statins, which of course, is a standard of care today, and provide perhaps a much-needed alternative for patients.

93. On that same call, Defendant Mayleben responded to a series of questions from Martin Douglas Auster ("Auster") of UBS Investment Bank as follows, in relevant part:

[Auster]

Tim, you guys have been studying this compound clinically, for several years now. Could you talk a little more specifically about the magnitude of efficacy you've seen in Phase II? What sort of de-risking, you think, has been accomplished? What sort of settings you have evaluated the drug in? And then kind of, when you make that leap into the pivotal studies that are ongoing, what changes have been made? What's different in the pivotal studies versus what we already know about the drug? What are we going to learn new?

[Defendant Mayleben]

***

So if you're familiar with aspirin or acetaminophen, it's about that size of a tablet so very, very easy to take. ***And as I mentioned, this has also been very safe and well tolerated***.

***

As I mentioned earlier, we have -- in our Phase II program, we had over [] 1000 patients, so a very robust Phase II program. We've tested this in all manner of hypercholesterolemic patients, so statin-intolerant patients, diabetic hypercholesterolemic patients, hypertensives, hypercholesterolemics, what we would call sort of regular hypercholesterolemic patients and then across all the risks spectrum as well, Marty, so low-risk, moderate-risk, high-risk patients. And then our Phase II program has also explored our drug in combination with all manner of other LDL-cholesterol lowering drugs. So ranging from low-dose statins, to moderate-dose statins, to high-dose statins, and of course, with ezetimibe as well.

***So I think, we've really robustly explored the profile, we substantially reduced the risk as we enter into Phase III.*** But one thing that I will highlight is, that our

Phase II program, as with all other LDL-cholesterol lowering drug development programs, had studies that ranged in duration from 6 to 12 weeks, most of them 12 weeks. And of course, in our Phase III program, we're going to be looking at long-term safety. 52-week studies for 2 of our studies and then a 12-week study, and a 24-week study. ***So I think, an answer to your last question, what we are going to learn from our Phase III program, is really confirmation of the safety profile of our drug or drugs through this broader exploration of the drug in longer-term safety studies effectively***.

94. Later on the call, Defendant Mayleben responded to further questions from Auster as follows, in relevant part:

[Auster:] Great. And then the other question I have about the pivotal program. There's been a lot of de-risking in terms of the LDL lowering in various settings from the Phase II. One of the questions that we don't know any reference from the Phase II, mostly 12-week studies. We don't know if 52-week safety is going to look like longer-term safety. What read-throughs, if any, do you have as you've got -- you must have multiple hundreds of patients now, that have gone through a year's treatment of bempedoic acid. What can you tell us about, in terms of clues from discontinuation rates, rolling over to the open-label extension, any kind of safety-driven protocol amendments you have had to make, given the feedback from DMCs and things like that? Or is there anything read-throughs from that you can tell us?

***

[Defendant Mayleben:] Sure. So a couple of things that I would say, just overall. ***During our Phase II program, just as sort of what did we see in our Phase II program, even out the 12 weeks, no safety signals coming out of the Phase II program.*** We mentioned earlier, this is a liver-targeted drug and in fact the drug is only active in the liver. ***So when you're looking for side effects or potential safety issues, interestingly, I think as Dr. Ference highlighted, during our March webcast, post-ACC webcast, because the drug is liver-targeted, if you're going to see some off-target effects, you are actually only going to see them likely in the liver***.

***

[Auster:] And the overall product continuation rate. Is that coming in line with expectations?

***

Yes. So yes, no surprises there. Again, keep in mind this is an oral drug. ***It's very well tolerated.*** And, as we say, it's convenient. So I think it's convenient to take

-- easy to take, and certainly something that folks in these trials would be adding to their regular oral therapy regimen.

95. The statements in ¶¶ 92-94 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

96. On June 7, 2017, Esperion made a presentation at the Jefferies 2017 Global Healthcare Conference, in which the Company stated that studies demonstrated that bempedoic acid was "***safe and well-tolerated***" and that the bempedoic acid and ezetimibe doublet pill was "***safe and well-tolerated***[.]"

97. The statements in ¶ 96 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

98. On June 21, 2017, Esperion made a presentation at the JMP 2017 Life Sciences Conference, for which Defendant Mayleben was a presenter, in which the Company stated that studies demonstrated that bempedoic acid was "***safe and well-tolerated***" and that the bempedoic acid and ezetimibe doublet pill was "***safe and well-tolerated***" (emphasis in original).

99. The statements in ¶ 98 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

100. On June 26, 2017, Esperion filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces FDA Confirmation of Regulatory Pathway to Approval for the Combination of Bempedoic Acid and Ezetimibe[.]" Esperion stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects.***"

101. The statements in ¶ 100 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

102. On June 26, 2017, Esperion hosted a call for investors and analysts, in which Defendants Mayleben and Bartram participated, amongst others. In connection with this call, Esperion made a presentation, in which the Company stated that studies demonstrated that the bempedoic acid and ezetimibe doublet pill was "***[s]afe and well-tolerated***[.]"

103. The statements in ¶ 102 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

104. On August 2, 2017, Esperion posted on its website a press release entitled "Esperion to Provide Bempedoic Acid Franchise Development Program Updates and Second Quarter Financial Results[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

105. The statements in ¶ 104 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

106. On August 8, 2017, Esperion filed with the SEC a Form 10-Q report for the quarter ended June 30, 2017, which Defendant Mayleben signed ("Q2 2017 10-Q"). Esperion stated the following regarding bempedoic acid's safety and tolerability, in relevant part:

> ***Previously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein, or hsCRP, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.

***

> With a targeted mechanism of action, bempedoic acid is a first-in-class, complementary, orally available, once-daily ACL inhibitor that reduces cholesterol biosynthesis and lowers LDL-C by up-regulating the LDL receptor, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.

107. The statements in ¶ 106 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

108. The Q2 2017 10-Q contained Defendant Mayleben's signed SOX certifications with language substantially similar in all material respects to that in Defendant Mayleben's signed SOX certifications in the 2016 10-K, which were articulated above in ¶ 79.

109. The statements in ¶ 108 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

110. On August 8, 2017, Esperion also filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Positive Top-Line Results From Phase 2 Study of Bempedoic Acid / Ezetimibe Combination Plus Atorvastatin[,]" stating that "*The Combination Therapy Was Observed to be Safe and Well-Tolerated*" (emphasis in original). Esperion issued several statements touting bempedoic acid's safety and tolerability, including the following, in relevant part:

> ***The bempedoic acid / ezetimibe combination plus atorvastatin was observed to be safe and well-tolerated.***
>
> "Patients in this study experienced nearly a 100 mg/dL drop in their LDL-C levels on the combo plus atorvastatin. ***These highly positive study results of the combination therapy demonstrate very robust and remarkably consistent LDL-C lowering with what appears to be optimal safety and tolerability***," said Tim M. Mayleben, president and chief executive officer of Esperion.
>
> ***
>
> ***Previously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDLC, a 26 percent

reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***.

111. The statements in ¶ 110 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

112. On August 8, 2017, Esperion also filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Provides Bempedoic Acid Franchise Development Program Updates; Reports Second Quarter 2017 Financial Results[.]" Esperion stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

113. The statements in ¶ 112 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

114. Strapped for cash, on August 10, 2017, Esperion filed with the SEC a prospectus supplement under SEC Rule 424(b)(5) in connection with the Company's underwritten offering of 3,565,000 shares of common stock, at a public offering price of $49.00 per share. Esperion incorporated by reference the Company's 2016 10-K, Q1 2017 10-Q, and Q2 2017 10-Q. Esperion stated the "***bempedoic acid / ezetimibe combination plus atorvastatin appeared to be safe and well tolerated and produced no increases in Aes***."

115. The statements in ¶ 114 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

116. On August 11, 2017, Esperion posted on its website a press release entitled "Esperion Announces Inducement Grants Under NASDAQ Listing Rule 5635(c)(4)[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and***

***well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

117. The statements in ¶ 116 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

118. On October 2, 2017, Esperion posted on its website a press release entitled "Esperion Completes Patient Enrollment in Global Pivotal Phase 3 Program for Bempedoic Acid[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

119. The statements in ¶ 118 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

120. On October 10, 2017, Esperion posted on its website a press release entitled "Esperion to Host Analyst and Investor Day Event on October 17[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

121. The statements in ¶ 120 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

122. On October 18, 2017, Cowen and Company ("Cowen") issued a report on Esperion, emphasizing the positive image that the Company created for bempedoic acid's safety and tolerability and how important this was for investors:

> The presentations further supported already-convincing evidence that bempedoic acid has the efficacy ***and safety*** to fulfill a large unmet need with an attractive commercial proposition.
>
> ***
>
> Additionally, Phase 2 safety updates were incrementally positive, with more patients now added to the pooled analysis.
>
> ***
>
> In a pooled safety analysis of the first nine Phase 2 studies, bempedoic acid appeared to be well tolerated, consistent with previous reports that had not included the 1002-038 safety data. The frequency of muscle-related adverse events was similar with bempedoic acid (13%), placebo (17%), and placebo + statin (12%), and slightly higher with ezetimibe (22%). Serious adverse events were infrequent, and elevations in liver function test (LFT) results were rare. While statins have a dose-dependent relationship with LFT elevations, the same is not seen with bempedoic acid. Additionally, bempedoic acid does not appear to be associated with changes in blood sugar, bilirubin, or renal function.

123. On November 7, 2017, Esperion filed with the SEC a Form 10-Q report for the quarter ended September 30, 2017, which Defendant Mayleben signed ("Q3 2017 10-Q"). Esperion stated the following regarding bempedoic acid's safety and tolerability, in relevant part:

> ***Previously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein, or hsCRP, ***and may potentially be associated with a lower occurrence of muscle-related side effects***. The bempedoic acid / ezetimibe combination pill is being developed for patients at high CVD risk with hypercholesterolemia.
>
> With a targeted mechanism of action, bempedoic acid is a first-in-class, complementary, orally available, once-daily ACL inhibitor that reduces cholesterol biosynthesis and lowers LDL-C by up-regulating the LDL receptor, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.

124. The statements in ¶ 123 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

125. The Q3 2017 10-Q contained Defendant Mayleben's signed SOX certifications with language substantially similar in all material respects to that in Defendant Mayleben's signed SOX certifications in the 2016 10-K, which were articulated above in ¶ 79.

126. The statements in ¶ 125 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

127. On November 6, 2017, Esperion filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Initiation of Pivotal Phase 3 Study for the Bempedoic Acid / Ezetimibe Combination Pill[.]" Esperion stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects.***"

128. The statements in ¶ 127 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

129. On November 9, 2017, Esperion posted on its website a press release entitled "Esperion to Participate in Fireside Chat at the Stifel 2017 Healthcare Conference[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

130. The statements in ¶ 129 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

131. On November 13, 2017, Esperion posted on its website a press release entitled "Esperion to Participate in Fireside Chat at the Jefferies 2017 London Healthcare Conference[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

132. The statements in ¶ 131 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

133. On December 1, 2017, Esperion posted on its website a press release entitled "Esperion Announces Inducement Grants Under NASDAQ Listing Rule 5635(c)(4)[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

134. The statements in ¶ 133 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

135. On January 3, 2018, Esperion posted on its website a press release entitled "Esperion to Participate in Fireside Chat at the 36th Annual J.P. Morgan Healthcare Conference[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of

LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

136. The statements in ¶ 135 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

137. On January 10, 2018, Esperion hosted a call at the JPMorgan Healthcare Conference. During the call, Defendant Mayleben responded to a series of questions from Jessica Macomber Fye ("Fye") of J.P. Morgan Chase & Co. ("J.P. Morgan") as follows, in relevant part:

> [Fye:] Okay. And heading into the -- particularly the 52-week safety study, what are your expectations for safety with longer-term dosing? I think we're going out substantially longer than the Phase IIs went. So how comfortable are you with the safety book profile for bempedoic acid alone and I guess ultimately in combo with Zetia? Also curious, I know, in the past, you'd mentioned increased statin exposure when co-administering bempedoic acid and statins. So does that factor into your thinking on long-term safety at all?
>
> [Defendant Mayleben:] Yes. ***So of course, we've been watching this very closely, and not just us, that is, the overall safety and tolerability of the program***. But we also have had a Data Monitoring Committee that has been meeting quarterly to review the program. And just, maybe scale-wise, I'd say a couple of things. First of all, going back to the Phase II program, keep in mind that we had 1,200 patients in our Phase II program. So 1,200 patients, almost 800 patients on drug, most of them taking the 180-milligram dose of bempedoic acid, low-, moderate-, high-intensity statins, ezetimibe as background therapy, patients who have multiple co-morbidities, whether it's hypercholesterolemia and hypertension or hypercholesterolemia and diabetes. ***We've had statin-intolerant patients, so a really comprehensive Phase II program. So before we even went into Phase III, we had a very good perspective on the safety and tolerability of bempedoic acid and even the combo pill.*** So going now from 1,200 patients in our Phase II program to 4,000 patients in our Phase III program, it's bigger and, as you noted, longer duration, but it's not 10x bigger, just to put it in perspective, like it was for the PCSK9s, for example, 400 to 500 patients to 4,000 to 5,000 patients in the Phase III program. So we've been very careful in terms of moving from Phase II to Phase III.

***

> And with respect to this, the issue that had been discussed previously about the increase in statin exposure, you would look for clinical symptomology associated with that. And again, keep in mind, we've got 3,000 patients in our Phase III program that are on a background of their maximally tolerated statin therapy. We know that -- we know from the baseline data that about half of those are on high-intensity statins, and we're not seeing any clinical symptomology. If we were seeing increase in the statin exposure, then we would expect to see increases in liver function tests. We'd expect to see increases in muscle-related side effects, ***and we're not seeing that***.

138. The statements in ¶ 137 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

139. On January 10, 2018, J.P. Morgan issued a report concerning Esperion, in which J.P. Morgan highlighted the importance of the Company's assurances about bempedoic acid's safety:

> **…and so far, sees no safety signals that warrant caution.** Mgmt noted that there have been no safety concerns with treatment of bempedoic acid thus far in any of their studies and remains confident that this will hold in phase IIIs. Encouragingly, based on blinded pooled data, the company is seeing rates of liver enzyme elevations and muscle AEs consistent with prior phase II data even assuming most of the events in the blinded data are on the bempa arm. [Emphasis in original.]

140. On February 20, 2018, Esperion filed a Form 10-K with the SEC for the year ended December 31, 2017, which Defendants Mayleben, Bartram, Dr. Goldstein, Janney, Dr. Newton, and Vitullo signed ("2017 10-K"). Esperion stated the following concerning bempedoic acid's safety and tolerability, in relevant part:

> ***Previously completed Phase 2 data demonstrated that this safe and well tolerated combination results*** in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein, or hsCRP, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.
>
> ***
>
> With a targeted mechanism of action, bempedoic acid is a first-in-class, complementary, orally available, once-daily ACL inhibitor that reduces cholesterol biosynthesis and lowers LDL-C by up-regulating the LDL receptor,

> ***and may potentially be associated with a lower occurrence of muscle-related side effects***.
>
> ***
>
> To date, in completed studies, approximately 800 patients have been treated with bempedoic acid for periods of up to 12 weeks at maximum repeated doses of 240 mg per day. ***Bempedoic acid has been safe and well-tolerated with no dose-limiting side effects identified to date in our ongoing or completed clinical studies. No clinical safety trends have emerged to date.***
>
> ***
>
> ***Previously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein, or hsCRP, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.
>
> ***
>
> With a targeted mechanism of action, bempedoic acid is a first-in-class, complementary, orally available, once-daily ACL inhibitor that reduces cholesterol biosynthesis and lowers LDL-C by up-regulating the LDL receptor, ***and may potentially be associated with a lower occurrence of muscle-related side effects***.

141. The statements in ¶ 140 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

142. The 2017 10-K included Defendants Mayleben and Bartram's signed SOX certifications with language substantially similar in all material respects to that in Defendant Mayleben's signed SOX certifications in the 2016 10-K, which were articulated above in ¶ 79.

143. The statements in ¶ 142 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

144. Esperion also posted the 2017 10-K on its website, along with a cover letter that Defendant Mayleben signed. Defendant Mayleben stated the following, in relevant part:

> Positive top-line results from the first pivotal Phase 3 study (Study 4 or 1002-048) of bempedoic acid in patients with atherosclerotic cardiovascular disease (ASCVD) or at high risk for ASCVD with hypercholesterolemia inadequately treated with background ezetimibe and up to the lowest daily starting dose of a

> statin, demonstrating 28% additional LDL-C lowering and 30% hsCRP reductions, ***and was safe and well-tolerated***;
>
> ***
>
> Positive top-line results from the Phase 2 study (1002-039) of bempedoic acid added-on to a once-monthly injectable PCSK9 inhibitor, demonstrating bempedoic acid provided 30% additional LDL-C lowering and 34% hsCRP reductions, and was safe and well-tolerated[.]

145. The statements in ¶ 144 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

146. On February 20, 2018, Esperion also filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Provides Bempedoic Acid Franchise Development Program Updates; Reports Fourth Quarter and Full Year 2017 Financial Results[.]" Esperion stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects.***"

147. The statements in ¶ 146 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

148. On February 23, 2018, Esperion posted on its website a press release entitled "Esperion Announces Inducement Grants Under NASDAQ Listing Rule 5635(c)(4)[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, a 26 percent reduction in high sensitivity C-reactive protein (hsCRP), ***and may potentially be associated with a lower occurrence of muscle-related side effects***."

149. The statements in ¶ 148 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

150. On March 7, 2018, Esperion filed a Form 8-K with the SEC, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Positive Top-Line Results from First Pivotal Phase 3 Study of Bempedoic Acid[,]" stating that bempedoic acid was "*Observed to be Safe and Well-Tolerated in This Study*" (emphasis in original). Esperion stated the following, in relevant part:

> In this study, ***bempedoic acid was observed to be safe and well-tolerated***. ***There were no differences in the occurrence of adverse events (AEs), serious adverse events (SAEs) or muscle-related AEs; and no differences in discontinuations due to AEs or muscle-related AEs between the bempedoic acid group compared to the placebo group.*** Two patients (1.1 percent) treated with bempedoic acid had elevations in liver function tests (ALT/AST) of greater than three times the upper limit of normal, repeated and confirmed. The cumulative number of patients now treated with bempedoic acid in Phase 2 clinical trials and in Study 4 totals 919. Of these, six patients (0.65 percent) had elevations in liver function tests.

151. The statements in ¶ 150 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

152. Also on March 7, 2018, Esperion posted on its website a press release entitled "Esperion to Participate in Fireside Chat at March 2018 Investor Conferences[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, and a 26 percent reduction in high sensitivity C-reactive protein (hsCRP)."

153. The statements in ¶ 152 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

154. Also on March 7, 2018, Esperion hosted a conference call for investors and analysts, in which Defendants Mayleben and Bartram participated, amongst others. Defendant Mayleben stated the following during his opening remarks, in relevant part:

> So let's turn now to the safety and tolerability observations. ***Looking at Slide 16. And again, consistent with prior studies with bempedoic acid, I'm very pleased to report that bempedoic acid was observed to be safe and well tolerated in this study***.
>
> ***
>
> In this study, once-daily oral bempedoic acid was ***safely*** and conveniently used to complement ezetimibe and low-dose statin therapy in these high-CV-risk patients who are considered statin intolerant and who require additional LDL-cholesterol lowering, again with no tolerability issues. And finally, I'll just highlight that we'll provide further data and details when we present the full results from this study at an upcoming medical conference and then, of course, publish the full results in a medical journal later this year.
>
> So looking ahead now, on Slide 20. We expect results from the 4 remaining pivotal studies will continue to confirm the highly attractive profile of bempedoic acid, which was first established in the very robust Phase II program that we conducted and then, most recently, confirmed with the top line results from this pivotal Phase III study, Study 4. So what is that? ***It's consistent additional LDL-cholesterol lowering and hsCRP reductions delivered in a safe, well tolerated and convenient once-daily pill that is complementary to existing standard-of-care oral LDL-cholesterol-lowering therapies*** and that, we believe, will be both accessible and cost-effective for patients, physicians and payers.

155. On the same call, Defendant Mayleben responded to a series of questions from Alexander Duke Schwartz ("Schwartz") of Stifel, Nicolaus & Company, Incorporated as follows, in relevant part:

> [Schwartz:] … And then another question, with your Phase III fixed-dose combination results upcoming in September, can you remind us of any key trial design differences or endpoints between today's Study 4 in your upcoming readout? And then specifically with today's data, what data will you be able to use to support the fixed-dose combination filing, efficacy, safety, both?
>
> ***
>
> [Defendant Mayleben:] Yes, sure. So that was a big question. So let me highlight a few things. So first of all the pivotal Phase III study for the bempedoic acid/ezetimibe combination pill is what's called a factorial design study. So for example, in this study, the main message was what additional LDL-cholesterol lowering can you get? So the primary message is for physicians and really for regulatory authorities as well, as they look at the benefit/risk of adding bempedoic acid to ezetimibe and to statins and of course, the conclusion from this

> study is, wow, 28% additional LDL-cholesterol lowering, 33% additional hsCRP reduction, ***and very safe and well tolerated in this study***.

156. In Esperion's presentation made in connection with the call, Esperion stated on slide 19 entitled "Study 4 Top-Line Data Highlights" that bempedoic acid was "observed to be ***safe and well-tolerated*** in this study[.]"

157. The statements in ¶¶ 154-56 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

158. On March 7, 2018, Cowen issued a report on Esperion, emphasizing the positive image that the Company created for bempedoic acid's safety and tolerability and how important this was for investors: "Now that safety results from more than 900 patients dosed with bempedoic acid are available, ***our confidence in bempedoic acid's safety and tolerability has incrementally increased***. We continue to believe that bempedoic acid has the potential to become a safe and effective treatment option for patients who cannot take statins or patients whose LDL-C levels are inadequately controlled by the statin doses they can tolerate."

159. On March 7, 2018, J.P. Morgan issued a report about Esperion and expressed the importance of bempedoic acid's safety: "Given that this is a relatively small and a short study (12 weeks, n=269), we are watching for the largest 52-week phase III safety study (n=2,230) expected in May to round out its safety profile."

160. On March 27, 2018, Esperion filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Positive Top-Line Results from Phase 2 Study of Bempedoic Acid Added-On to a PCSK9 Inhibitor in Patients with Hypercholesterolemia[,]" stating that bempedoic acid was "*Observed to be Safe and Well-Tolerated in This Study*" (emphasis in original). Esperion issued several statements touting bempedoic acid's safety and tolerability, including the following, in relevant part:

> "***Bempedoic acid has previously demonstrated the ability to complement currently available standard-of-care oral LDL-C lowering therapies, and the results of this Phase 2 study show that bempedoic acid can also be safely and effectively used in patients who require additional LDL-C lowering despite taking an injectable PCSK9 inhibitor***," said Tim M. Mayleben, president and chief executive officer of Esperion. "These Phase 2 results provide consistent evidence and further support that bempedoic acid is poised to become the broadly accessible, complementary, once-daily, oral LDL-C lowering therapy that is appealing to patients, physicians and payers."
>
> In this study, ***bempedoic acid was observed to be safe and well-tolerated***. … The cumulative number of patients now treated with bempedoic acid in completed Phase 2 and Phase 3 clinical trials totals 947. Of these, six patients (0.63 percent) had elevations in liver function tests.

161. The statements in ¶ 160 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

162. Also on March 27, 2018, Esperion hosted a conference call for investors and analysts, in which Defendants Mayleben and Bartram participated, amongst others. Defendant Mayleben in his opening remarks stated the following regarding bempedoic acid's safety and tolerability, in relevant part:

> ***So moving onto safety and tolerability, we highlight the results on Slide 7, and these results are consistent with prior studies with bempedoic acid. And I'm pleased to share that overall, once-daily oral bempedoic acid added on to the injectable PCSK9 inhibitor therapy was observed to be safe and well tolerated.***
>
> ***
>
> So once-daily oral bempedoic acid has consistently demonstrated the ability to complement currently available standard-of-care oral LDL-cholesterol lowering therapies, ***and the results of this Phase II study show that bempedoic acid can be safely and effectively used in patients who require LDL-cholesterol lowering despite taking an injectable PCSK9 inhibitor.***
>
> ***
>
> ***We expect the pivotal Phase III program will confirm the safety, tolerability and consistent complementary LDL-cholesterol lowering efficacy of once-daily oral bempedoic acid and once-daily oral bempedoic acid/ezetimibe combination pill*** in ASCVD patients with hypercholesterolemia who continue to have elevated

> LDL-cholesterol levels despite the use of maximally tolerated statins and ezetimibe, and leaving them at high risk for cardiovascular events.

163. During the same call, Defendant Mayleben responded to a series of questions from Michael Jonathan Yee of Jefferies LLC confirming his awareness of the trial data and assuring investors that the Company shared all significant data with them:

> [Michael Jonathan Yee:] … As it relates to the blinded data that you've referred to a few times, which I think makes a lot of people feel pretty comfortable. You probably acknowledged that it's certainly individual outliers that would be of any material concern at this point. You feel very comfortable that the DSMB criteria should be looking at all those cases? ***And if there was anything significant, you would have been alerted to anything clinically meaningful?***
>
> ***
>
> [Defendant Mayleben:] ***Exactly***, Mike. And I think we have a world-class DMC that has supervised many studies. These guys are very experienced. And so I think, you said it well that if there were anything of significance that was coming out from their review of the unblinded data, ***we would be made aware of that, and of course, we'd be making you aware of it.*** So yes, we feel as good as one can feel until obviously you see the unblinded data. But I think, we feel very comfortable with the data that we've seen, the blinded data that we've seen and the blinded data that we've shared with you all.

164. The statements in ¶¶ 162-63 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v)**.**

165. In Esperion's presentation made in connection with that call, Esperion stated on slide 11 entitled "1002-039 Top-Line Data Highlights" that bempedoic acid was "observed to be safe and well-tolerated in this study, comparable to placebo[,]" and the Company on slide 12 entitled "1002-039 Top-Line Phase 2 Add-on to PCSK9i" stated the following, in relevant part: "In this Phase 2 study, once-daily, oral bempedoic acid 180 mg provided clinically and statistically significant LDL-C lowering and reductions in hsCRP when added on to an injectable PCSK9i, ***and was observed to be safe and well-tolerated***[.] … In the coming months, ***results from our remaining pivotal Phase 3 studies are expected to further validate the safety, efficacy***

***and tolerability profile of bempedoic acid and the bempedoic acid / ezetimibe combination pill*** as convenient, once-daily, oral therapies that are complementary to existing standard of care oral LDL-C lowering therapies[.]"

166. The statements in ¶ 165 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v).

167. On March 27, 2018, Chardan Capital Markets, LLC ("Chardan") issued a report on Esperion, emphasizing the positive image that the Company created for bempedoic acid's safety and tolerability and how important this was for investors:

> As we approach key pivotal phase III data in May 2018, the remaining issue for us is the potential for rare unexpected side effects, a concern for any late-stage product. Though safety so far is clean, integrated data are for just 947 patients. Study 1 (1,950 patients), in particular, will do much to address any lingering concerns. We thus model a 50% POS for BA, leaving the potential for significant upside to our PT with further clinical progression.
>
> ***
>
> Our PT would go higher with robust safety datasets in 2018.

168. On March 27, 2018, Cowen issued a report on Esperion, emphasizing the positive image that the Company created for bempedoic acid's safety and tolerability and how important this was for investors:

> ***The clean safety profile from top line data is reassuring.*** We reiterate our Outperform recommendation ahead of the next pivotal data readout in May.
>
> ***
>
> The fact that no imbalance in AEs was observed between the bempedoic acid arm and the placebo arm continues to reinforce our view that bempedoic acid is well tolerated. ***We had noted in our discussions with investors, following the disclosure of Study 4 results earlier in March, that investor concerns very much center on bempedoic acid's safety profile.***
>
> ***

> ***With results available now from nearly 950 patients dosed with bempedoic acid, we expect confidence in bempedoic acid's safety and tolerability profile to continue to increase. Overall, we believe bempedoic acid will continue to demonstrate the potential to become a safe and effective treatment option for patients whose LDL-C levels are inadequately controlled by whatever background therapy they might be taking.***

169. On March 27, 2018, J.P. Morgan issued a report on Esperion, emphasizing the importance of bempedoic acid's safety:

> Esperion reported results from a phase II study … While a small, short term study, we are encouraged that bempedoic acid was well-tolerated with no significant differences in occurrence of AEs (32.1% vs. 23.3% pbo), SAEs (3.6% vs. 0% pbo; 1 case of flu on trmt arm – not considered trmt-related), or muscle-related AEs (3.6% vs. 3.3% pbo), as well as no differences in the rate of discontinuations due to AEs or muscle-related AEs. There were no reported elevations in LFTs.

170. On April 13, 2018, Esperion posted on its website a press release entitled "Esperion Announces Inducement Grants Under NASDAQ Listing Rule 5635(c)(4)[,]" in which the Company stated that "***[p]reviously completed Phase 2 data demonstrated that this safe and well tolerated combination*** results in a 48 percent lowering of LDL-C, and a 26 percent reduction in high sensitivity C-reactive protein (hsCRP)."

171. The statements in ¶ 170 were materially false and misleading for the reasons set forth in ¶ 76(i)-(v)**.**

## The Truth Begins to Emerge

172. On May 2, 2018, Esperion filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Positive Top-Line Results from Pivotal Phase 3 Long-Term Safety Study of Bempedoic Acid" ("5/2/18 8-K"). Esperion announced results from the second pivotal Phase 3 study (study 2 or 1002-040), the largest of the Phase 3 program, with troubling safety and tolerability results from the bempedoic-acid group:

> Discontinuations due to AEs were 10.9 percent and 7.1 percent, respectively for the bempedoic acid and placebo groups; discontinuations due to muscle-related

> AEs were 2.2 percent and 1.9 percent, respectively in the bempedoic acid and placebo groups. In the study, 0.54 percent of patients treated with bempedoic acid and 0.13 percent of patients in the placebo group had elevations in liver function tests (ALT/AST) of greater than three times the upper limit of normal, repeated and confirmed. The cumulative number of patients now treated with bempedoic acid in Phase 2 and Phase 3 clinical trials totals 2,434. Of these, 0.58 percent had elevations in liver function tests greater than three times the upper limit of normal, repeated and confirmed.

173. It got worse. In this relatively detailed paragraph in the 5/2/18 8-K about adverse effects, Esperion conveniently did not include that ***there were 13 deaths in the bempedoic-acid group (sample size of 1,487) or 0.9%, compared to only 2 deaths in the placebo group (sample size of 742) or 0.3%***. Instead, Esperion shoved these death-related statistics into a subsequent table in the 5/2/18 8-K. The disclosure also did not point out that the patient populations were in fact ***the same*** for the drug and placebo groups. In other words, the drug group did not contain sicker patients than the control group.

174. News of these shocking, adverse safety results caused Esperion's common-stock share price to experience a dizzying fall of $24.75, or 35.11%, to close at $45.75 on May 2, 2018, on exceptional trading volume.

175. On May 23, 2018, Esperion filed with the SEC a Form 8-K, which Defendant Mayleben signed, with a press release entitled "Esperion Announces Third Pivotal Phase 3 Study of Bempedoic Acid Meets Primary Endpoint" ("5/23/18 8-K"). Esperion announced an analysis of the cumulative Phase 2 and Phase 3 results from more than 4,000 total patients. Crucially, Esperion revealed ***an additional death in the bempedoic-acid group as the sample size increased, while there were no additional deaths in the placebo group as the sample size increased***; ***as of this date, there were 14 deaths in the bempedoic-acid group (sample size of 2,668) or 0.5%, compared to only 2 deaths in the placebo group (sample size of 1,338) or 0.2%***. Also, additional indications of safety and tolerability were more negative for the bempedoic-acid

group, including, without limitation, "[d]iscontinuations due to AEs were 9.5 percent and 6.9 percent, respectively, for the treatment and placebo groups[.]"

176. In the 5/23/18 8-K, Esperion also announced "positive" top-line results from the third pivotal Phase 3 study (study 3 or 1002-046). ***Several indications of safety and tolerability were more negative for the bempedoic-acid group***, including, without limitation, adverse events experienced by 64.1% or 150 patients of the 234-patient sample size of the bempedoic-acid group versus 56.8% or 63 patients of the 111-patient sample size of the placebo group:

> Serious adverse events (SAEs) in the bempedoic acid arm were 6.0 percent compared to 3.6 percent in the placebo arm. None of the SAEs were deemed to be related to bempedoic acid by the study investigator. Discontinuations due to AEs were 18.4 percent and 11.7 percent, respectively, for the treatment and placebo groups; importantly, there was no single class of events or event that was responsible for the difference. The rate of elevations in liver function tests in this study was 0.43 percent, repeated and confirmed.

177. On this news, Esperion's common-stock share price fell $1.42 or 3.57% to close at $38.32 on May 23, 2018, on exceptional trading volume.

178. On May 25, 2018, Chardan issued a report on Esperion, emphasizing the overhang of bempedoic acid's safety concerns and the Company's lack of transparency:

> The bull versus bear case and why we have concerns
>
> ***
>
> On 2 May, Esperion reported positive efficacy data from the 52-week phase III study (Study 1; NCT02666664) of bempedoic acid (BA) in 2,230 inadequately-treated ASCVD patients. ***However, an imbalance of deaths is concerning.*** In Study 1, at 12 weeks, BA (on a background of maximally-tolerated statins) lowered LDL-C by 20% on treatment (18% ITT), vs. placebo (p<0.001). hsCRP was reduced by 22% (p<0.001). However, 13 deaths (0.87%, 13/1,488) in the BA-treated group were reported, vs. 2 deaths (0.27%, 2/742) for placebo. Enrollment was 2:1 (BA:placebo). ***Normalizing for enrollment and the placebo death rate, we calculate there were 3.2x more deaths reported for BA patients than expected*** (13, vs 4 expected using 0.27%x1,488). After the 2 May data, in an 8-K, Esperion disclosed details of the deaths. Recall with our 5 December 2017 and 27 March 2018 research, we became more positive on ESPR but maintained a Neutral rating, as we were *"unable to rule out rare, unknown side*

> *effects for BA which could emerge in larger phase III studies”*. ***As this issue has become more of a risk***, we return to a lower POS for BA (<20%), down from 50%, driving our PT from $100 to $32.50.
>
> ***
>
> **The bear case: Our statistical analyses suggest the imbalance of deaths across phase II/III trials *may not be due to chance.*** (Study 3 reported this week.) When imbalances on deaths are considered on specific *“causes”* of death like neoplasms or CV-related deaths, the results on deaths in Study 1 may be 40%-70% likely due to chance based on Fisher’s exact test. **However, using a chi-squared test, we calculate p<0.05 the overall imbalance of deaths (14 versus 2; see table) is an independent event**. (See Figure 1 for our calculations.) ***To us, this analysis (which has limitations) suggests that even if deaths are unrelated to BA, the FDA may have cause to wait for the 12,600-patient CLEAR Outcomes (NCT02993406) data before making a decision on BA approval.***

179. On May 23, 2018, J.P. Morgan issued a report on Esperion entitled “Remain UW Following Study 3; Focus Remains on Safety – ALERT[,]” emphasizing the overhang of bempedoic acid’s safety concerns and the Company’s lack of transparency:

> ***This morning, Esperion announced results from Study 3, the second of two phase III statin intolerance trials, and we believe our Underweight thesis is intact that it will be challenging to dig out from the safety overhang of Study 1 with the data from smaller studies.*** On an ITT basis, bempedoic acid achieved LDL-C lowering of 23% from baseline at 12 weeks or 22% pbo-adjusted, which is a bit lower than we would have expected in statin-intolerant patients. Following Study 1 top-line results, investors were looking to this study for reassurance on safety, but given its relatively small size (n=345) in the context of the overall phase III program, Study 3 represents only a slice of the overall safety picture. There were no deaths in either arm of this 24-week trial in lower-risk patients (compared to Study 1). ***That said, overall AEs were slightly higher for BA vs pbo (64% vs 57%) and perhaps more concerning was the imbalance in discontinuations due to AEs (18.4% vs. 11.7% pbo) and increased SAEs with BA (6.0% vs. 3.6%). Mgmt noted that none of the SAEs were deemed related to trmt and no single specific AE drove discontinuation. Curiously, it appears that disclosure on certain topics is varying: CV events in this study were not provided. It is a short trial that may limit the interpretability of that data, but in the context of a CV death imbalance in Study 1, it was noticeably absent in today’s update. Overall, we continue to believe it will be difficult for the smaller trials expected in August (FDC trial; n=382, 12 wks safety) and Sept (Study 2; n=779, 52 wks safety) to reverse the sentiment/safety concerns in the wake of the longest and largest phase III Study 1 results.***

180. Overall, prior to the beginning of the revelations of the truth, Esperion's common-stock shares closed at $70.50 on May 1, 2018. After the curative disclosures alleged here, the share price has plummeted $32.18, or 45.65%, to $38.32 at the close on May 23, 2018, eviscerating significant value. Plaintiffs and other Class members suffered significant losses and damages as a result of Defendants' alleged fraud and this precipitous decline in the market value of Esperion's common-stock price.

**Additional Allegations Supporting Scienter**

181. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

***Lucrative Compensation and Bonuses Were Based on Advancing the FDA Process***

182. Esperion's compensation committee tethered exceptionally lucrative compensation and bonuses for executives and/or directors to their acceleration of the process for seeking NDA approval for bempedoic acid. For example, the "2017 Corporate Base Goals" were the following: "Advance the bempedoic acid LDL-C lowering program by reaching confirmation with FDA on the Phase 3 development program for, advance business development initiatives, or complete a financing to further fund the development program"; "Complete enrollment of the bempedoic acid pivotal Phase 3 long-term safety study (i.e. Study 1)"; "Complete enrollment of the three pivotal Phase 3 efficacy studies (i.e. Study 2, Study 3 and Study 4)"; "Reach confirmation with FDA on the Phase 3 development program for the bempedoic acid / ezetimibe combination pill to support approval of an LDL-C lowering indication"; [and] "Initiate and report positive top-line results from Phase 2 (1002-038) 'Triplet Oral Therapy' study[.]"

183. Indeed, Esperion admitted that "[o]ur compensation committee set certain of our 2017 corporate goals to be very aggressive and at challenging levels, such that the attainment of

all of our corporate goals would require a high level of effort and execution on the part of the named executive officers. During 2017, we made significant progress towards achieving our clinical development and business goals for the year and our compensation committee determined that we had achieved each of our base and stretch corporate goals at target, resulting in payout of the portion of cash bonuses under our 2017 cash incentive compensation program based upon achievement of corporate goals at 130% of target[.]"

***Uncharacteristically Large Insider Sales of Esperion Common Stock During the Class Period***

184. Several of the Individual Defendants sold sizable, suspicious, and unusual amounts of their Esperion common stock during the Class Period. Only one of the Individual Defendants, Defendant Dr. Goldstein, executed additional common-stock sales prior to the Class Period. But the proceeds of those pre-Class Period sales paled in comparison to his Class Period sales.

***Defendant Dr. Goldstein***

185. Between April 23 and 24, 2015, well before the Class Period, Defendant Dr. Goldstein through Aisling Capital II, L.P. sold approximately 217,469 shares of Esperion common stock, generating proceeds of $23,523,461.

186. As of February 1, 2017, Defendant Dr. Goldstein beneficially owned 1,742,833 shares of Esperion common stock, which equated to 7.7% of Esperion's common stock outstanding at that time.

187. On March 21, 2017, Defendant Dr. Goldstein sold approximately 487,358 shares of Esperion common stock for an approximate price of $43.48 per share, generating approximately $21,190,326 in proceeds.

188. On March 22, 2017, Defendant Dr. Goldstein sold approximately 312,642 shares of Esperion common stock for an approximate price of $38.82 per share, generating approximately $12,136,762 in proceeds.

189. On December 15, 2017, Aisling Capital II, L.P. sold approximately 62,525 shares of Esperion common stock for an approximate price of $57.90 per share, generating approximately $3,620,197 in proceeds. The general partner of Aisling Capital II, L.P. is Aisling Capital Partners, L.P., the general partner of which is Aisling Capital Partners, L.L.C., for which Defendant Dr. Goldstein is a Managing Partner and is on the investment committee and shares the power to vote, invest, and dispose of these shares.

190. On December 18, 2017, Aisling Capital Partners, L.L.C. sold approximately 21,471 shares of Esperion common stock for an approximate price of $59.99 per share, generating approximately $1,288,053 in proceeds. Defendant Dr. Goldstein is a Managing Partner of Aisling Capital Partners, L.L.C. and is on its investment committee and shares the power to vote, invest, and dispose of these shares.

191. In total, during the Class Period, Defendant Dr. Goldstein sold approximately 883,996 shares of Esperion common stock, generating approximately $38,235,338 in proceeds during the Class Period.

192. As of March 1, 2018, Defendant Dr. Goldstein beneficially owned only 35,047 shares of Esperion common stock, which was not even a single percentage of Esperion's common stock outstanding at that time.

***Defendant Janney***

193. Prior to the Class Period, Defendant Janney did not sell any Esperion common stock during 2014 through 2016.

194. As of February 1, 2017, Defendant Janney beneficially owned 1,815,675 shares of Esperion common stock, which equated to 8.0% of Esperion's common stock outstanding at that time.

195. On March 21, 2017, Defendant Janney sold approximately 350,000 shares of Esperion common stock for an approximate price of $45.80 per share, generating approximately $16,029,263 in proceeds during the Class Period.

196. As of March 1, 2018, Defendant Janney beneficially owned only 681,035 shares of Esperion common stock, which equated to only 2.5% of Esperion's common stock outstanding at that time.

***Defendant Dr. Newton***

197. Prior to the Class Period, Defendant Dr. Newton did not sell any Esperion common during 2014 through 2016.

198. As of February 1, 2017, Defendant Dr. Newton beneficially owned 850,725 shares of Esperion common stock, which equated to 3.7% of Esperion's common stock outstanding at that time.

199. On March 29, 2018, Defendant Dr. Newton sold approximately 25,000 shares of Esperion common stock for an approximate price of $72.37, effected through an Exchange Act Rule 10b5-1 Sales Plan that Defendant Dr. Newton adopted on February 21, 2018, generating approximately $1,809,277 in proceeds during the Class Period.

200. As of March 1, 2018, Defendant Dr. Newton beneficially owned 871,117 shares of Esperion common stock, which equated to 3.2% of Esperion's common stock outstanding at that time.

***Defendant Vitullo***

201. Prior to the Class Period, Defendant Vitullo did not sell any Esperion common stock during 2014 through 2016.

202. As of February 1, 2017, Defendant Vitullo beneficially owned 2,357,894 shares of Esperion common stock, which equated to 10.4% of Esperion's common stock outstanding at that time.

203. On December 6, 2017, Defendant Vitullo sold approximately 9,326 shares of Esperion common stock for an approximate price of $53.85 per share, generating approximately $502,205 in proceeds.

204. On January 25, 2018, Defendant Vitullo sold approximately 11,674 shares of Esperion common stock for an approximate price of $71.79 per share, generating approximately $838,076 in proceeds.

205. In total, during the Class Period, Defendant Vitullo sold approximately 21,000 shares of Esperion common stock, generating approximately $1,340,282 in proceeds during the Class Period.

206. As of March 1, 2018, Defendant Vitullo beneficially owned only 1,175,997 shares of Esperion common stock, which equated to only 4.4% of Esperion's common stock outstanding at that time.

207. ***In total during the Class Period, these Individual Defendants sold approximately 1,279,996 shares of Esperion common stock, generating approximately $57,414,160 in proceeds.***

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

208. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Esperion common stock during the Class Period and were damaged upon the

revelation of the alleged curative disclosures ("Class"). Excluded from the Class are Defendants, Esperion's officers and directors, and at all relevant times, their immediate family members and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

209. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Esperion's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of proposed Class members. Record owners and other Class members may be identified from records maintained by Esperion or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210. Plaintiffs' claims are typical of the Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that are complained of herein.

211. Plaintiffs will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

212. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are the following:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Esperion;

- whether the Individual Defendants caused Esperion to issue false and misleading statements during the Class Period;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Esperion securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and if so, what is the proper measure of damages.

213. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

214. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the misrepresentations and omissions were material;

- Esperion's common stock is traded in an efficient market;

- Esperion's common stock met the requirements for listing and was listed and actively traded on NASDAQ, a highly efficient and automated market, with over 5,164,013 shares traded on average weekly during the Class Period;

- As a public issuer, Esperion filed periodic public reports with the SEC and NASDAQ;

- Esperion regularly communicated with public investors through established market-communication mechanisms, including, without limitation, through the regular dissemination of press releases through major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Esperion was followed by at least 10 securities analysts who wrote reports that were widely distributed and publicly available;

- unexpected material news about Esperion was rapidly reflected and incorporated into the Company's common-stock price during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Esperion's securities; and

- Plaintiffs and Class members purchased, acquired, and/or sold Esperion securities between the time that Defendants failed to disclose or misrepresented material facts and the time that the true facts began to be revealed, without knowledge of the omitted or misrepresented facts.

215. Based upon the foregoing, the market for Esperion's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares. Plaintiffs and the Class members are entitled to a presumption of reliance upon the integrity of the market.

216. Also, Plaintiffs and the Class members are entitled to the presumption of reliance established by the U.S. Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

217. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

219. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

220. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Esperion common stock during the Class Period.

221. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Esperion were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by

virtue of their receipt of information reflecting the true facts about Esperion, their control over, and/or receipt and/or modification of Esperion's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

222. Individual Defendants, who are Esperion's senior officers and/or directors, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and they intended to deceive Plaintiffs and other Class members or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Esperion personnel to members of the investing public, including Plaintiffs and the Class.

223. Each Individual Defendant possessed and acted upon unlawful, self-interested motive in perpetrating the alleged fraudulent scheme.

224. As a result of the foregoing, the market price of Esperion's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and other Class members relied on the statements described above and/or the integrity of the market price of Esperion's common stock during the Class Period in purchasing Esperion common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

225. Had Plaintiffs and other Class members been aware that the market price of Esperion's common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information that Defendants did not disclose, they would not have purchased Esperion common stock at the artificially inflated prices that they did, or at all.

226. As a result of the wrongful conduct alleged herein, Plaintiffs and other Class members have suffered damages in an amount to be established at trial.

227. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and other Class members for substantial damages that they suffered in connection with their purchase of Esperion securities during the Class Period.

228. This action was brought less than five years after the fraud alleged herein occurred and within two years of when Plaintiffs discovered or should have discovered the fraud with reasonable due diligence.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

229. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

230. During the Class Period, the Individual Defendants participated in the operation and management of Esperion and conducted and participated, directly and indirectly, in the conduct of Esperion's business affairs. Because of their senior positions, they knew the adverse non-public information about Esperion's misstatements and omissions.

231. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Esperion's results of operations and financial condition and to correct promptly any public statements issued by Esperion that had become materially false or misleading.

232. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various

reports, press releases, and public filings that Esperion disseminated in the marketplace during the Class Period concerning Esperion's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Esperion to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Esperion within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of Esperion's common stock.

233. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Esperion.

234. This action was brought less than five years after the fraud alleged herein occurred and within two years of when Plaintiffs discovered or should have discovered the fraud with reasonable due diligence.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action and certifying Plaintiffs as class representatives under Federal Rule of Civil Procedure 23 and designating Plaintiffs' counsel as class counsel;

(b) awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including, without limitation, expert fees; and

(d) awarding Plaintiffs and other Class members such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 22, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Tamar A. Weinrib
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
taweinrib @pomlaw.com
jnematzadeh@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Lead Counsel for Plaintiffs***

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

***Additional Counsel for Lead Plaintiffs***